To our first case of the day, which is United States of America v. Zayas, we have Mr. O'Brien, Ms. Olszewski, Mr. O'Brien. May I remove my mask, Mr. Speaker? Please. And as counsel know, we have limited, as much as anything for your benefit, argument to three issues that were of particular interest to the panel. That does not certainly suggest that the other issues are not of interest, certainly does not suggest that we've not carefully read the briefs and will consider those issues as well. But given the limitations on argument time, we felt it best to narrow the focus here to allow you to really home in on those issues that engaged the panel in particular. Thank you, Your Honor. With the permission of the court, I would first address the issue of whether or not the evidence at trial was sufficient for a jury to convict the defendant of distribution of illegal substances within a thousand feet of a playground open to the public. Has the microphone been activated? I can hear him, but it's not resonating quite as much. Maybe it's the positioning of the microphone. It's not an adjustable microphone. The court referenced a Texas case, the Jackson case, and asked counsel to comment on that case in its argument. Obviously, from our briefs, our position is that the evidence in this case was not sufficient for a jury to conclude beyond a reasonable doubt that the defendant delivered illegal substances within one thousand feet of a playground open to the public. Do you see this as a sufficiency issue or as a jury instruction issue? Well, that's a good question. The judge did, in his instruction to the jury, indicate that the jury had to find that the area was open to the public. There was not a request made by defense counsel for a specific interrogatory on that issue. Right. And in fact, we're reaching this on appeal of a ruling in a Rule 29 motion, right? Yes, Your Honor. So how does that affect our standard of review, if at all? I don't know the answer to that question. I'm sorry? I don't know the answer to that question. The way I see it is that the government had a burden of establishing beyond a reasonable doubt that this area was open to the public. The evidence from the owner of the... I mean, I don't mean to be certainly in any way quarrelsome here, but you say you don't know the answer, but that's a pretty important question for us, isn't it? Because the inquiry for us, if we had a well-preserved question regarding the jury instruction, would be in one direction. On the other hand, with a Rule 29 motion, we're really looking at a different question on review, aren't we? Yeah, I think the standard would be different. It goes to sufficiency. I think it's a sufficiency issue. The issue was discussed with the judge whether or not this count should be submitted to the jury. The judge made a specific finding, which is in the record, which he read into the record, indicating that he felt that the evidence was sufficient and that he would let the jury decide. Was any instruction or guidance given to the jury as to how they should go about determining whether this playground was open to the public? Or was it simply put to them that they had to find that it was? Well, there was evidence. Let's start with there was evidence presented, and there was testimony from the owner that it was not open to the public. The only people who could get there was people who paid a fee to attend the school. And I think that that was the context in which the jury... Isn't it true that anyone could pay that fee? Any member of the public could pay that fee and attend the school, couldn't they? Any member of the public could pay that fee and send to school. That's true, but that doesn't make it open to the public. Why doesn't it? That's the question. Why doesn't it? Well... Did the jury have any guidance to determine that? I think the word, the concept of open to the public, I think the judge did not explain any more than that fact that that's what it had to be. Well, it's not... I think that's common. I think a jury can decide that. Well, that's the critical question, isn't it? Because the district court addressed it as a matter of law, didn't he? Yes, it did. Okay. And it's not a statutorily defined term, or at least not statutorily defined within the statutes that are applicable... It is not. In this case, so did the court look to any other source of law, any other definition in any statute whatsoever upon which he relied in concluding it's a matter of law? No. The question of open to the public. I don't believe the court did. I think the court, the matter came before the court, and the court was argued back and forth by counsel, and the court decided that based on the evidence presented, a jury could conclude it was open to the public. I think, of course, he didn't say this, but I think that the court probably felt that the concept of open to the public was something that the jury didn't need instruction on, that the jury could understand what open to the public meant. All right. If you're right, and this is a question of law, then that, if you're right, we have to vacate and simply send it back on that enhancement, right? I think so, yes. So are the facts more compelling or less compelling in your favor in this case or in the Curley case, the case out of Texas? Can you repeat that? Yeah. Curley is the case we referenced you. I refer to it as the Jackson case. We'll call it the Texas case, right? So are the facts more compelling in the Texas case to support your position or less compelling? I think this case is stronger because, number one, the gates that was locked, she used the term latched. Number two, the Texas case involved a church. I think churches are generally open. This was a private school that you had to pay tuition to. You don't have to pay tuition for churches. So I think from the facts, I think that this case is a stronger case that the evidence was not sufficient. In Curley, though, there were four gates that kept people out of that area, some of which were locked, some of which were unlocked. But even the ones that were unlocked were controlled by a locked gate. Isn't that a big distinguishing factor? You've got four gates setting it apart. Even a member of the church would have trouble getting into that playground. The Curley case had four gates. I believe that only one was locked and the other three were open. In this case, the gates, the testimony of record from the owner of the facility was the gate was latched, was locked. What is latched? To my mind, latched does not mean locked. Latched means there's a latch, and that's not the same as a lock. It's a latch. You have to maneuver some mechanism, a latch, the same way you would on most gates. Well, I think taken along with the other testimony that when she said it was not open to the public, remember on Jackson, the so-called expert said it was open to the public. The owner of the facility said it is not open to the public. You have to pay tuition and the gates are latched. Yeah, but if it's a legal question. That tells me that the gates are closed. What deference do we give that? She probably hadn't even read the statute. What deference do we give that a layperson is saying is a matter of law is open to the public? Well, I don't think she was talking about a matter of law. She was asking a question of fact, a factual question that I asked her, and she answered that as any normal citizen would answer. Is it open to the public? Is your facility open to the public? She said, no, you have to pay tuition and it's locked. I don't think she was attempting to give a legal opinion. She was answering a question of fact. No, it's not open to the public. Well, and this would necessarily be a fact-bound question, if you're correct, that it should have been submitted to the jury, correct? Well, Your Honor, it was submitted to the jury because the jury was told they had to make that finding. Relative to open to the public? Yeah. They didn't have to make a specific finding, but they were instructed on that issue. And they did, and that goes back to the Chief's initial question as to our standard of review. We've got a jury verdict, which we have to pay incredibly strong deference to, saying that this facility, based upon the evidence they heard, is open to the public. How do you overcome that? Well, because there's no evidence that it was. I mean, it is a very high standard to overrule the verdict of a jury. In this case, the jury concluded it was open to the public. There was no testimony it was open to the public. The only testimony was from the owner that it was not open to the public, it was only open to people who paid tuition, and that there were gates and that they were latched. I submit that that evidence, being the only evidence of record and the only witness who testified on that fact, meets the high standard that the jury verdict should be set aside. What do you make of the testimony at 426 where she's asked, is it open to the public, and she answers, yes, it is? But taken in context, she said you have to pay tuition. Well, she specifically asked if it's open to the public. Members of the public could pay tuition. Right. But then, you know, at 428, she's asked, and is the area open to the general public for use, and she said no. Yes. I think the ‑‑ obviously, at trial, there were a lot of issues. The issues involving the death of Mr. Zayas really took center stage. While this issue was presented, it was a count, and it was presented, there was one witness, and I think if you read her testimony in total, that this facility was not open to the general public. It was open to people who came in and paid tuition. And if you go, if you say that the fact that a member of the public can come in and pay tuition and, therefore, it makes it open to the public, that would make the Philadelphia Country Club open to the public, and members of the public could go sign an application, be admitted, and go on the premises. I don't ‑‑ is there anywhere that we're ‑‑ Excuse me. Let me ask my question, please. Excuse me. Hasn't there been an aligning that you're even participating in here between the daycare center and its purpose and the physical playground itself? I'm not suggesting that they're two completely different entities, but paying tuition to attend the daycare center, to what extent, or perhaps I should ask the question, what kind of weight does that have with respect to the issue of accessibility, physically, to the play area? Well, consider the fact, Your Honor, that there was, she did testify that this was part of the licensed area. It was ‑‑ there was a gator fence around it, and it was part of the licensed area. The only testimony about use was that her students could use it. My question was actually trying to help you a little bit, but I guess I missed the mark. I see the issue of paying tuition to attend a daycare center as a very, very limited import to whether or not, under all circumstances applicable here, the playground area that was attached to it or close to it was, for our purposes, because the term is undefined, open to the public. Well, not sure as I understand your question. The way I approach this is I think you just look at all of the testimony that she offered and that it was part of the licensed area. To get in there, you had to pay tuition. Let's move on since we've really used up nearly all of your time to this point on the one issue. Let's move to one of the other issues. The issue, of course, that's of the most importance to the defendant, to Mr. Zayas, is the question of whether or not the evidence was sufficient for the jury to conclude that the drugs that he delivered to her the afternoon before she died were the drugs that caused her death. Didn't he admit to as much? He admitted that he gave her heroin. He admitted he sold her drugs. The question is, did those drugs cause her death? Our argument is twofold. Number one, we argue that it's undisputed that she died from fentanyl. And there's no evidence that ties him into fentanyl. He is interviewed twice about it. He said he killed her heroin. In fact, in his first interview that it would be his Mirandais confession, he talks about purchasing 20 bags and giving the seller three bags back. And he talks about it being heroin. It's clear from that statement. You just referred to the Mirandais confession. It doesn't come into this case, does it? Isn't that the initial statement that was made by Mr. Zayas, which you sought to make sure was not opened up as a testimonial issue during the trial, am I correct? Yes, Your Honor. All right, so just so I'm clear, that really doesn't enter into the equation here for us, does it, the Mirandais confession? Well, to the extent that he mentioned there that it was heroin, I think it's Well, we're talking about what's in front of the jury. It was not in front of the jury. Okay, so what about the April 2017 DEA report? What is Zayas purporting to say that appears in the DEA report? Doesn't he really imply that he bought the drugs, that he sold the price from D? Isn't that part of what's contained in that report? Well, yes, for purposes of this case, the defendant admitted, did not dispute the fact that he purchased drugs and he delivered them to Price at 511 on the afternoon of the 6th of February, and that he does not dispute that. We do dispute that he delivered fentanyl to her. The evidence of record is that her death was caused by fentanyl. There's nothing anywhere in the record that ties any fentanyl into Price. Mr. Brown, let me ask you this. It wasn't that this statement was in front of the jury. There was evidence that Zayas made the statement during one of his Mirandai statements that he, the heroin, let's say, I'll call it heroin, the substance that he ultimately gave to Price, he took some of that substance himself. He passed out from it. Yes. Okay, was that before the jury? Yes, that was before the jury. Okay. That was like. Mr. Brown, you've got to let us ask the question. Then we'll hear the answer, but you've got to pause to let us get the question out. If that was in front of the jury, then also in front of the jury was the fact that he had never passed out before. He thought it was strange that Haynes, who was offered some of the same stuff that he had taken, Haynes didn't want to get high, and he thought that was strange. That was all in front of the jury. Is that right? That's correct. So why couldn't the jury infer that whatever it was that was in that bag was something that, was something other than what Zayas thought it was because he'd been doing heroin a long time. He'd never passed out from just doing heroin. He told Price in the text messages that he had some, quote, good shit, it was super shit, and then he took some of that good shit from a blue bag, the same colored bag that the residue that was tested for fentanyl came out of, and he passed out and never had before. And Price, I think, at one point told him, I think it was in front of the jury, that it's good that he only did two, good that Zayas only did two because it was so strong. Now, why wouldn't that be pretty strong circumstantial evidence? Granted, circumstantial, but pretty strong for the jury to assume he may have thought it was heroin, but it wasn't heroin at all because he doesn't pass out using heroin. This stuff made him pass out with his fentanyl. Even beyond a reasonable doubt, it seems to me that that may be enough to get the government over the hump, and we're here on sufficiency of the evidence, a very deferential standard. Why isn't that enough to convict him on the distribution causing death? Well, Your Honor, I think it's not a permissible inference. I think that that crosses that difficult to determine line between what can be a permissible inference and what is just speculation. Well, what else could they infer? He passed out for the first time, all the time he was doing heroin, whatever was in that blue bag, same basically package, but the same, I don't know what the word would be, the same stuff, the same stuff basically that he gave to Price. It was that blue bag. He reacted to that differently than he ever had before. He tells Price that whatever he's got is really strong shit, better than he's ever had before, but he didn't tell her that. She then inferred that because of her discussion with him. You know, I'm not sure circumstantial evidence gets a lot stronger than that. I think that's what the issue is. Your Honor, you're defining the issue in the case that our position is that he's specifically charged here with causing somebody's death for fentanyl, and that the most the jury could determine is that he sold her some heroin and that there's no heroin in her system. He sold her what he thought was heroin. The heroin didn't cause her death. He sold her what he thought was heroin. He believed it to be heroin, yes. Right, right. But the government has to prove, as I understand it, that it was a controlled substance, correct? Or does the government have to prove that it was fentanyl? Well, in this case, I think they have to prove it was fentanyl because their testimony said that fentanyl caused the death. It didn't say she died from heroin. It didn't say she died from a controlled substance. It said she died from fentanyl. So I think that in this case, the government's burden is to prove that the drugs he delivered to her were fentanyl, the ones that caused her death. Well, that's the key. It's not a statutory requirement, but it is a factual requirement here, given the chain of the actual delivery of the drug, correct? Yes, Your Honor. So the fentanyl has to be traced in that chain to Mr. Zias. Zias does not have to know that it's fentanyl. Is that right? Zias does not have to know it's fentanyl. He does not have to know it's fentanyl, but the drugs he delivered had to be fentanyl. And there's nothing to tie him into fentanyl. Because you believe that none of the inferences that Judge McKee has suggested can arise here are permissible inferences. Is that correct? That's correct. That's our argument. Well, let's move then to the pregnancy issue. Your Honor, there's not a lot of authority on this issue. Our position is that the government, under the statute, should have the burden to establish that he knew she was pregnant when he sold the controlled substances to her. Obviously, transferring the substance to her was a crime. It's an enhanced crime if she's pregnant. And we submit that it should be the government's burden to prove that. The government, in their brief, relies on the cases involving a minority that say that the United States does not have the burden to prove specific knowledge of the individual delivering the drugs that the person to whom they were delivered was a minor. I think that that has to be taken into context with the laws protecting. We have a whole, in the state courts, a whole structure of laws in the civil and criminal area to protect minors. The government has a parent's patrie obligation going back to common law over minors. And so I think that not that women don't deserve help and protection, but it's not ingrained in the law that it is for minors. And so I think that that's a difference in the situation. Let's say that on the legal question, you are correct, Mr. O'Brien, and I would grant you that there are some strong arguments supporting that position. But in this case, looking at the record, isn't there sufficient evidence, even under a knowledge requirement, to support the jury's determination? And that is the testimony of family members concerning the obvious pregnant status, the gestation period here, eight and a half months. And I believe there was more than one family member testifying to her physical appearance and condition. That, together with the fact that she walked out to the car at least one time, doesn't all that, even with a knowledge requirement, support the jury's determination? I don't think so, Your Honor. Because I would agree that if there was testimony that there was, that Mr. Zayas had the ability to view her under normal circumstances, surely he would have known she was pregnant. I think someone who's eight and a half months pregnant, it's visible. Maybe not two months, maybe not three months, but eight and a half months, I would agree with that. Isn't that enough then? This is July. We're not talking winter when she may have had a down padded coat on. The testimony, even the technicians who went in and saw her when they saw her, said that she was noticeably pregnant. It was her brother, I'm sorry, her mother stated during the trial she was here. When asked about the pregnancy, her sister stated she had that pregnant belly. And Price's brother stated that she was noticeably pregnant. He asked if she was noticeably pregnant. He responded, very. I'm not sure how you overcome that. That's her sister. That's her mother. People who live with her and with her every day. I submit the only evidence in this case that shows that he should have known she was pregnant is, there are two exhibits in the supplemental appendix, Exhibit 1 and Exhibit 6. Exhibit 1 is the picture of her standing next to his automobile at 1516 on the 6th. Exhibit 6 is 1711 when I believe he delivered the substances to her. That's in the middle of winter in Hazleton, the highest city in Pennsylvania in terms of altitude. I mean, it's cold down there. She had a coat on. It was July. It was 5 o'clock in July. This is not on the record, but actually there's a website that will tell you if you put in the date and the location, it will give you the temperature spread. And the temperature was at a high of 90 in Hazleton that day. Again, that's not in the record. I'll stand corrected on that. I misspoke in my note here since July. But if you look at those pictures, the only evidence that I see in the record of him being able to determine whether or not she was pregnant is those pictures, Exhibit 1 and Exhibit 6. They don't obviously show what he saw, but that's the best we have. That's all we can work for. And when I look at those pictures, I don't automatically conclude she was pregnant. And clearly there was evidence she was pregnant. There's no question about that. There was a baby that died in the tragedy. But there's no evidence that he knew any of that. There's no evidence he was ever in the house. There's no evidence he ever had any prior contact with her other than by text. You don't see anybody on a text. The only evidence that he had seen her would have been at those two occasions on July 6th. And she had a jacket on, and you look at the pictures and I don't see it. And I think the government has the burden to prove that he should have done it. And Judge McKee, any other questions? I have none, thank you. All right, Mr. O'Brien, we'll have you back on rebuttal. Thank you. Ms. Olszewski. Good morning, Your Honors. May it please the Court, my name is Michelle Olszewski, and I represent the United States in this matter. And I will start with the government's argument with respect to the distribution in this case taking place within 1,000 feet of a protected area, that case being that protected area. Protected area, public area, big difference. Correct, Your Honor. It was not a school, it was a daycare center. Was it open to the public? It was open to the public. What do you make of the testimony that I referenced earlier that the government didn't cite in its brief? Or she specifically asked, and is that area open to the general public for use? And her answer was no. What the owner of the daycare center said when she was specifically asked was, it is open to the public. On cross-examination, she qualified that by saying that you must enroll. And then on redirect, when asked whether or not enrollment was open to the public, she said absolutely. So along those lines, I would – Let's go back to Judge Smith's point. There's the issue of enrollment in the school, and there's the issue of the actual playground area. And she says unequivocally that it was not open to the public. She said enrollment is open to the public. For the school, for the school. And is this area open to the general public for use? She says no. That's correct. One must pay a fee, not a tuition, but a fee for daycare services there. This is a public – this is a business that invites the public in and serves the public. And I would suggest that Congress has specifically differentiated between open to the public and a public playground. And the reason why I would say that is because a public playground, in my mind, would be something more narrow than open to the public. Open to the public is a business, could be a business, that serves the public, in this case, children. And I would find it hard to believe that in light of the legislative intent for this particular statute, that Congress, if all of the other apparatuses and visualizations are there for a playground, would differentiate between protecting children who pay a fee for that playground with respect to children who don't pay a fee. Well, let's say paying a fee isn't dispositive. Because the problem I've had with this all along is in the absence of a statutory definition, we're left to look elsewhere for guidance, obviously. You just used the phrase, in my mind. Well, in terms of what a public playground is, minds may differ over this, jurors may differ, but we try to give them as much guidance as possible. What guidance was this jury given in terms of what a public playground was? The guidance the jury was given, Your Honor, was evidence through testimony. Testimony of the owner. That's not guidance. That's something that the advocates present by way of witnesses and exhibits to the finders of fact. The jury is told at the outset of a trial and throughout that they look to the court for guidance, that the law comes only from the judge. What did the judge give them for purposes of making this determination? The jury instruction in this case only included the judge advising the jury that they had to find that the distribution occurred within 1,000 feet of a daycare center with an attached playground. In other words, there was no guidance whatsoever provided to this jury on the elemental requirement that the play area be open to the public. Am I correct? They were not specifically instructed as to the definition of, or that they would have to find that the playground was open to the public. They were not instructed, the instruction did not include the statutory language. It did not include that they would have to find that the playground was open to the public, only that the distribution took place within 1,000 feet of a daycare center with an attached playground. However, the jury did hear about this particular playground being open to the public, as well as seeing pictures of this playground, as well as seeing the daycare center from all sides such that they saw advertisements, they saw a sign for Busy Bee Daycare inviting the public in. It was an open-air playground, and it serves children. So the distribution that the jury saw actually play out on video surveillance took place right across the street from this playground with all of the apparatuses in place. So let me ask you this. If you're right, then what does the term open to the public mean? Because when I first looked at this, I thought to myself, well, that would be a member of the Busy Bee to get to the playground, so maybe it's not open to the public, but anybody, theoretically anyone who is a member of the public, could pay the fee, become part of the Busy Bee Daycare Center, and then have access to the playground so it's open to the public. But the more I thought about it, if that's what open to the public means, then everything is open to the public because there is nothing out there that I can think of, and maybe you can help me, there's nothing out there that I can think of that is not open to the public, given some preliminary qualification or requirement that you pay a fee or become a member of the controlling organization. That's not much of a rule by which we can give any guidance to the court. I believe that the court should interpret that. I believe the question is a hybrid question between fact and law with respect to whether or not something is open to the public and that a jury should hear about evidence, whether or not this particular playground, as was at issue in this case, was open to the public. We've got to know what to do with the evidence. They hear the evidence, they've got to know what to do with the testimony that they've heard. It's a technical term here, and I'm not sure at all the jury, in fact I'm pretty sure the jury did not know how to make that assessment. And help me with my dilemma, if you could. If I was right initially when I looked at this, that it's open to the public because anybody can pay the tuition, get the kid into the Busy Bee, and therefore have access to the playground. If that's what this means, then why put the term in there? Because everything is open to the public. I would disagree, Your Honor, that everything is open to the public. What is it? Give me an example of something not open to the public within that very broad sense of potentially accessible to me. I believe that there's a private school on a private location with a fence. I send my kid to the private school. My kids, in fact, went to a private school. And I wouldn't consider their playground private because anybody, assuming that the kid could get accepted there and pay the outrageous tuition, anybody could have access to that playground. So that doesn't help me. That's my quandary. Your definition of open to the public means everything is potentially open to the public, and it takes the phrase open to the public right out of the statute. It creates a situation where we amend the statute by taking out open to the public. Any playground, then, is sufficient. I believe, again, it's a factual issue whether or not a particular playground. We've gone over that, that it's a factual issue. But that's not what Judge McKee has asked. And let me just tag on something to his question because if everything is open to the public, then Congress just included language that would have been, that is, totally unnecessary in the statute, right? Correct. So the language that Congress chose to include must necessarily have some limiting purpose, right? Correct. All right. So what is that limiting purpose? And how is a jury to be given a basis for applying that limiting language? I believe some examples where facilities that serve children would not be open to the public, such as a playground would perhaps be something that is religious based, based in religion, a Jewish school or Jewish center, or perhaps. Doesn't the word open necessarily include the concept of accessibility? Not alone, perhaps, not only that. But doesn't openness really go to the question of accessibility to the public? I believe that's part of it, Your Honor. But there are facilities, there are clubs, there are groups that discriminate and only allow entry to certain members based upon certain factors. This was not one of those facilities. This facility served any member of the public. And I don't believe we can assume or interpret Congress's passage of this statute to preclude, just because you have to pay a fee to play on this playground, that that is not a protected, that is not a playground that meets the definition of open to the public. Because, again, Congress could have said only public playgrounds. Congress did not say that. Congress specifically used the terms open to the public. That's why I go back to the fact. They didn't. They just said public playground. Then the definition of playground is where open to the public comes in. But let me ask this. If you're right, and I think you started out talking about the congressional intent to protect children, but it does not make any sense that Congress would say we're going to protect children if they go to a public school, we're not going to protect them if they go to a parochial school, or if they go to a synagogue, and there's a daycare program at that synagogue to which there's a playground attached, we're not going to protect them. That doesn't make any sense to me. Even Congress would not act that irrationally, would they? And because there's not a whole lot of case law that have looked at this, but the cases that have looked at this that I was able to find actually assume what Your Honor is arguing, which is such as the Clanton case with an Army base. This is a protected area, and, however, that court, that Sixth Circuit court said, we recognize that this is not necessarily open to the public. However, there's public entry onto that Fort Campbell Army base every day, such that that playground there is accessible to the members of the public. Here's my point, that everything's open to the public. If you can talk about military-based playground being open to the public, then to my mind, everything is open to the public, and that beats that phrase right out of the definition of playground. I would respectfully disagree that every playground would be open to the public. I believe there are factual scenarios where that would not be the case, but I also believe that – What are they? What are they? Help me understand that. Military playground is open to the public. Help me understand what playground would not be open to the public, at least potentially not open to the public. A playground that is on a private home, that is a rather large property, that even if it's not fenced in, it is a private property. It could have – They take care of that by talking about you've got to have three tiers of water, a merry-go-round in the spring. It's kind of like the old Supreme Court case about when Christmas is secular and when it's not. You've got to look at the height of the Santa Claus in the manger. It's almost like that. You've got to look at what's on that property. Well, there's only two Tina Tartars here. There's no merry-go-rounds. You don't get to the Festival of the Three. You could use that definition, and that would get rid of the situation you're talking about and eliminate a situation where the case talks about a playground on a large family ranch, which kind of tells you it's in Texas, where they have to isolate the playground with a fence. And that playground on the ranch, which I can't even conceive of in my mind, would not be open to the public. That's different, but to the kind of examples you're giving us, they all seem to be open to the public. Can you help us with a rule? When we write the opinion, if we write one, how would you fashion a rule that could be generally applied? And a rule that would be useful to a district judge in instructing a jury. Right. Let me first preface this by saying that I believe that the concerns of Your Honors is the broadness of the way Congress has used this term, but I think also that's an indication of Congress's intent to protect children from this kind of activity and seeing this kind of activity. But what I would say, Your Honor, is we should look to you. Then why put open to the public in there if that's their intent? Because by doing that, using your example as something that would not be open to the public, they excluded kids in a synagogue. They excluded kids that went to a Quaker school. They would be excluded. So why would they put that in there if their intent is to broadly protect kids? What difference does it make if it's open to the public or not, unless you've got a family ranch situation? If that were Congress's sole intent, all they would have to say is, any place where children may assemble or congregate. Right? That's correct. But instead what they did was limited. That's correct, Your Honor, but that would include those backyard playgrounds that are rather large as well. So they eliminated that, but I would suggest that. And what Judge McKee asked a few minutes ago was, can you give us some suggestion of how we should craft a rule? And you haven't done that. I would suggest that the court look to whether or not this is a business that does not discriminate, that they invite the public into this facility, that they advertise, and that the enrollment, if we're talking about particular daycare, is open to anyone under any persuasion. And it meets the definition of having the apparatuses. It would be accessible to children on a regular basis. And the testimony in this case was that this was a daycare center that served 30 to 35 children on any given day. So I think that a lot of this should be left to the common sense of a jury, conditioned upon them getting the facts in front of them through the trial. And I believe the government did this in this case. We certainly don't adhere to the clock in this court most of the time, as you probably know. And your time has been used up so far entirely on this one issue. But let me ask Judge Estrepo if he wants to pursue this issue further with you. If not, I think we should probably move on to the other two issues we've asked you to address. Yes, Your Honor. With respect to the sufficiency of the evidence of the drug distribution resulting in death, I believe the evidence in this case was really overwhelming when you follow the timeline and the facts. And that is that the defendant admitted, and his Miranda's confession came in, Your Honor. It wasn't suppressed. The jury heard all about what the defendant did that day in delivering drugs to Catherine Price. He admitted to delivering a controlled substance. The delivery took place at about 5.11 p.m. that afternoon. A little more than four hours later, she was dead. The evidence is that she used, it suggested that she used what the defendant gave her. What was the specific evidence? There were texts involved. There were texts. What did the texts demonstrate? And the texts demonstrated that this defendant had a relationship with Catherine Price prior to July 6th of 2016 because he had been providing her with heroin, but there was something different about this source, this new contact. He advertised it as being different, and it was different because it was fentanyl. He doesn't have to know he was delivering fentanyl. We know she used it because she commented to the defendant it was good. Thank God you only did two. And there was only fentanyl in her system. Expert testimony at trial indicated that had she used heroin, as the defendant wanted the jury to believe he delivered, there would have been morphine or the metabolites of heroin in her system at death. There was none. And the toxicologist also testified that that first usage that she talked about at 5.31 p.m. that afternoon exacerbated the second usage, which we believe occurred, and the jury heard evidence occurred about 9.30 that night, and that she died immediately because she died sitting up with the drugs, the paraphernalia right in front of her, indicating that she did not have time to put those drugs away. So the fentanyl that knocked out the defendant, as he indicated, because he claimed never in his life had he ever been, ever passed out from heroin, caused him to pass out. It caused the death of Catherine, and that was clear. And the only evidence, the only drugs that were found in Catherine's bedroom was in, was a little bit of powder in the blue bag that was right in front of, on her headboard within inches of her head. That was fentanyl and only fentanyl. So I think it's clear from the evidence that the defendant delivered fentanyl to her that day. It was a new source. He bragged about the power of it. She used it. She died. And he passed out. And the defendant had a prior relationship with Catherine Price. So with respect to the pregnancy issue, unless there are additional questions on the sufficiency of the evidence. I have none. Oh, good. With respect to the pregnancy, the United States would urge the court to look at this particular statutory enhancement as a strict liability crime. And I say that because, first, the government's position is we don't have to prove that Catherine was pregnant when the defendant delivered. Before you go there, was there sufficient evidence for Zias to know she was pregnant? There absolutely was, Your Honor, and this is why. She was very pregnant. She waddled when she walked. She had that pregnant waddle. The video that the members of the jury saw showed Catherine walking out of her house, walking up to the car with the defendant in it twice that day, not one time, twice that day. And she was huge. Her family members described her as huge. When the paramedics approached her dead body, the paramedic testified. I knew immediately she was pregnant because she was not far away from giving birth. And that was all confirmed through the pathologist and through witnesses. In addition, don't forget this, the defendant had a history with Catherine. This was not a one-time isolated distribution. He knew her. And there was testimony at trial that he had been with her about a month earlier, and that testimony came from Stacey Scott. And that testimony was presented to show that assisted the United States in finding out the cell phone number that Catherine was talking to who it belonged to. So all of that evidence was in front of the jury. But the jury should not have been instructed to find that the government had to prove the defendant knew she was pregnant because that would be illogical and inconsistent. Inconsistent with the statutory intent of Congress, if they're interested in protecting the health and welfare of a pregnant woman, a woman could be four months pregnant and no one would ever know. A woman could be really large and not be pregnant. A woman could be six months pregnant, carrying late into her pregnancy, and no one would ever know. So a defendant should not be able to turn a blind eye, as courts have said, to the status of the person to whom they're distributing the drugs to. And that's what we proved. The defendant knew that she was pregnant at trial. It should be a strict liability crime. If there are no further questions from my colleagues, thank you. Thank you, Your Honor. We will have Mr. O'Brien back for rebuttal. Thank you, Your Honor. If I could make four points. First of all, I took a look at the transcript where the judge made his ruling, and I understand better your initial question. Which ruling? His ruling on the open to the public issue. And I understand better your question. That ruling was made after the verdict in which he did deny our Rule 29 motion. And so perhaps the legal standard for the court on this issue would be whether or not there was an error of law as opposed to sufficiency of the evidence. And that was, I think, what you were getting at earlier that I missed. Second point I'd like to make is I just suggest that in this case we have this issue where there's an awful lot of evidence that the drugs that killed this poor young woman could have been sold by D. He sold her drugs in a blue bag. The only fentanyl found at the site was fentanyl in a blue bag. I think that you have a case here where the evidence is equal on both sides. I saw, and I mentioned in the brief, that line of cases after the Carabillo-Rodriguez case in which the court held that if the evidence could go one way or the other, it's up to the jury. It can be considered sufficient. Most of those cases involve the knowledge of someone, not a fact-specific inquiry like what drugs killed somebody. So just ask the court to consider whether that line of cases should be applied here and whether, in fact, the evidence is of equal weight that the drugs, that D's drugs rather than Zayas' drugs caused her death and that, therefore, the verdict to the jury should be set aside. In response to Judge McKee, he asked me for evidence in the record that would indicate that Mr. Zayas' drugs did not cause the death of Ms. Price. One thing I didn't mention is she did live for 4 1⁄2 hours after she allegedly took his drugs. He passed out. She lived for 4 1⁄2 hours, at least 4 1⁄2 hours. She's 930. She takes the dog for a walk. And she's not found dead until, I don't know, sometime, I think, a little after midnight. So she could have lived for between 4 1⁄2 to 7 hours, and I think that that would be a fact that would be contraindicative of his drugs causing her death. The final thing, the question, the U.S. attorney, Ms. Olszewski, mentioned that how well she was acquainted with Mr. Zayas. I'm not sure that the evidence supports all that, but I don't want to go into it. Just note that four days before this. I think you just did get into it by saying the evidence doesn't support it. Go ahead. Four days before, four days before these tragic events, she told, and Price told Dee, the person who sold her the drugs in the blue bag, that she was his only supplier. Thank you, Mr. O'Brien. And thank you to both of counsel for your arguments. I would request that we have a transcript prepared of the argument in this matter. Ms. Olszewski, you are from the Scranton area. That's actually a rather common name, I think, or one name that I know. In my common pleas days, I knew Judge Peter Paul Olszewski. Any relation? No, Your Honor. He was my boss for a period of time, but no relation. Oh, all right. Thank you very much to both of you. We'll take the case under advisement. Thank you.